UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOHN M. GUZY,

                 Petitioner,

  v.                                                     9:23-CV-0339
                                                        (TJM/ML)

DONITA McINTOSH,

                 Respondent.
_____

APPEARANCES:                                                       OF COUNSEL:

JOHN M. GUZY
Petitioner, pro se
16-B-1847
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

HON. LETITIA JAMES                                      JALINA J. HUDSON, ESQ.
Attorney for Respondents                               Ass't Attorney General
New York State Attorney General
28 Liberty Street
New York, NY 10005

MIROSLAV LOVRIC
United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

**I.    INTRODUCTION**

    Petitioner John Guzy seeks federal habeas relief pursuant to 28 U.S.C. § 2254. Dkt. No. 1, Petition ("Pet."), at 1-20; Exhibits, Dkt. No. 1 at 21-36, 100-43; Memorandum of Law, Dkt. No. 1 at 37-99.[1]

---

[1] For the sake of clarity, citations to petitioner's filings refer to the pagination generated by CM/ECF, the Court's electronic filing system.

After an initial review of the pleading, the Court directed petitioner to file an affirmation explaining why the statute of limitations should not bar his action. Dkt. No. 3, Decision and Order ("March Order"). In compliance with the March Order, petitioner timely filed said affirmation, as well as supporting exhibits, arguing that he is actually innocent which excuses the untimeliness of his petition. *See generally* Dkt. No. 5.

The Court directed respondent to answer the petition, and respondent successfully requested permission to file a limited answer addressing only the issue of timeliness. Dkt. No. 6, Decision and Order (directing response); Dkt. No. 10, Letter Motion (seeking to file a limited answer); Dkt. No. 11, Text Order (granting motion).

Petitioner was provided an opportunity to reply and timely filed his Traverse. Dkt. No. 16, Text Order (setting deadline); Dkt. No. 17, Traverse.

For the reasons which follow, it is recommended that the petition be denied and dismissed in its entirety as untimely.

## II.   THE PETITION

Petitioner challenges a 2016 judgment of conviction in Chenango County, upon a nonjury trial, of second degree murder, second degree attempted murder, two counts of first degree assault, two counts of second degree criminal possession of a weapon, third degree criminal possession of a weapon, tampering with physical evidence, driving while intoxicated, and six counts of fourth degree criminal possession of a weapon. Pet. at 2-3; *accord People v. Guzy*, 167 A.D.3d 1230, 1231 (3rd Dep't 2018).[2]  The New York State Appellate Division, Third Department affirmed the conviction, and, on March 4, 2019, the New York State Court

---

[2] A copy of the Third Department's decision was included with the Petition. Dkt. No. 1 at 22-32.

of Appeals denied leave to appeal. *Guzy*, 167 A.D.3d at 1238, *lv. denied*, 33 N.Y.3d 948 (2019); *accord* Pet. at 3-4.[3] Petitioner did not file a petition for a writ of certiorari. Pet. at 4.

Petitioner also applied for a writ of error coram nobis, in the Third Department, on February 25, 2020. Pet. at 4. On May 21, 2020, the writ was denied. *Id.* at 4-5.[4] Petitioner unsuccessfully applied for leave to appeal, which the Court of Appeals denied on July 28, 2020. Dkt. No. 1 at 35.

Petitioner also filed a motion seeking to vacate his conviction pursuant to New York Criminal Procedure Law § 440 ("440 motion") on October 7, 2020. Pet. at 5. The 440 motion was denied on April 21, 2022. *Id.* Petitioner unsuccessfully applied for leave to appeal, which the Third Department denied on July 19, 2022. *Id.* at 5-6.[5]

Petitioner contends that he is entitled to federal habeas relief because (1) his counsel was constitutionally ineffective for a variety of reasons, Pet. at 6-12, Dkt. No. 1 at 72-81; and (2) the evidence was legally insufficient to support his conviction, Pet. at 13-14, Dkt. No. 1 at 82-96.

## III. DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), enacted on April 24, 1996, established a one-year statute of limitations for prisoners to seek federal review of their state court criminal convictions. 28 U.S.C. § 2244(d)(1). The one-year period generally begins to run from the date on which the state criminal conviction became final by the

---

[3] A copy of the Court of Appeals' decision was included with the Petition. Dkt. No. 1 at 33.

[4] A copy of the Third Department's decision was included with the Petition. Dkt. No. 1 at 34.

[5] A copy of the Third Department's decision was included with the Petition. Dkt. No. 1 at 36.

conclusion of direct review or by the expiration of the time to seek direct review. 28 U.S.C. § 2244(d)(1)(A); *Gonzalez v. Thaler*, 565 U.S. 134, 149-50 & n.9 (2012).[6]

For purposes of section 2244, a state conviction becomes "final" when the United States Supreme Court denies an application for a writ of certiorari or when the time to seek certiorari has expired, which is ninety days after the date on which the highest court in the state has completed direct review of the case. *Gonzalez*, 565 U.S. at 150; *Saunders v. Senkowski*, 587 F.3d 543, 547-49 (2d Cir. 2009).[7]

In this case, the Third Department affirmed petitioner's conviction and, on March 4, 2019, the Court of Appeals denied petitioner's application for leave to appeal. *Guzy*, 167 A.D.3d at 1238, *lv. to appeal denied*, 33 N.Y.3d at 948. Petitioner did not file a writ for certiorari; therefore, his conviction became final for purposes of AEDPA ninety days later, on June 3, 2019, and he had until June 2, 2020, to timely file his habeas petition. 28 U.S.C.

---

[6] Other dates from which the limitations period may start running are the date on which an unconstitutional, state-created impediment to filing a habeas petition is removed, the date on which the constitutional right on which the petitioner bases his habeas application was initially recognized by the Supreme Court, if the right was newly recognized and made retroactively applicable, or the date on which the factual predicate for the claim or claims presented could have been discovered through the exercise of due diligence (newly discovered evidence). 28 U.S.C. § 2244(d)(1)(B)-(D).

While petitioner fails to allege that an alternate accrual date applies, liberally construing the pleadings the Court considers whether petitioner's claims of the discovery of new evidence would shift the commencement of the limitations period. Petitioner contends that the new evidence that establishes his actual innocence was offered during a civil trial on March 23, 2017. Dkt. No. 5 at 3-17, Guzy Affidavit ("Guzy Aff."),¶ 3. Because that predates when petitioner's criminal conviction became final, using it would result in a limitations period with an even earlier expiration date. Thus, even if an alternate accrual date could apply to the instant action, it would not render it timely.

[7] in light of the global pandemic, the Supreme Court issued a general order declaring that for a lower court decision filed between March 19, 2020, and July 18, 2021, the deadline for applying for certiorari would be temporarily extended from ninety to 150 days. *See* 334 F.R.D. 801 (U.S. Mar. 19, 2020), *available at* https://www.supremecourt.gov/orders/courtorders/031920zr_d1o3.pdf (extending deadline); U.S. Sup. Ct. Orders Rescinded, 28 U.S.C. (U.S. July 19, 2021), *available at* https://www.supremecourt.gov/orders/courtorders/071921zr_4g15.pdf (rescinding pandemic-instituted protocols). However, because the Court of Appeal's decision was dated on March 4, 2019, prior to the general order's issuance, the extended filing deadline does not apply to the instant action.

4

§2244(d)(1); *Saunders v. Senkowski*, 587 F.3d 543, 548-49 (2d Cir. 2009).[8]  The petition was filed on February 28, 2023.  Pet. at 18.  That is two years and almost nine months beyond the expiration of the limitations period.[9]

   1.   **Statutory Tolling**

The one-year limitation period under AEDPA is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2); *Saunders*, 587 F.3d at 548.  The tolling provision "excludes time during which properly filed state relief applications are pending, but does not reset the date from which the one-year statute of limitations begins to run."  *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam).  The tolling provision excludes from the limitations period only the time that the state relief application remained undecided, including the time during which an appeal from the denial of the motion was taken.  *Saunders*, 587 F.3d at 548; *Smith*, 208 F.2d at 16.

Petitioner argues that his petition should be tolled, specifically due to a New York State Executive Order.  Pet. at 16.  As previously discussed by the Court in its March Order, petitioner's reliance on the New York State Executive Order is misplaced because the remedy he is seeking is created pursuant to a federal statute, which applies a federal limitations period.  March Order at 5-6 (distinguishing instant petition from the civil rights complaint filed by the pro se plaintiff in *Bell v. Saunders*, No. 9:20-CV-0256 (BKS/TWD), 2022 WL 2064872, at *4 (N.D.N.Y. Jun. 8, 2022)).

---

   [8] Ninety days from March 4, 2019, was June 2, 2019; however, that was a Sunday.  *See* FED. R. CIV. P. 6(a)(1)(C).

   [9] Under the prison "mailbox rule," a petitioner's application is deemed filed on the date he delivers it to the prison authorities for mailing.  *Houston v. Lack*, 487 U.S. 266, 270 (1988)

5

However, tolling is still applicable. It does not concern New York State's Executive Order, but instead, petitioner's state court collateral challenges to his conviction. 28 U.S.C. § 2244(d)(2); *Saunders*, 587 F.3d at 548.

Petitioner's writ of error coram nobis was filed on February 25, 2020, beginning the tolling period, after 267 days of the limitations period has expired. The tolling continued through the date the Court of Appeals opinion, on July 28, 2020. Accordingly, petitioner had 98 days left to timely file a federal habeas corpus petition.

Seventy-one of those 98 days elapsed before statutory tolling re-commenced on October 7, 2020, when petitioner filed his 440 motion. Consequently, petitioner had twenty-seven days remaining to file the instant action after petitioner's 440 motion was denied by the Third Department on July 19, 2022. Therefore, in order to be timely, the petition needed to be filed on or before August 15, 2022. However, the instant petition, dated February 28, 2023, was filed over six months beyond the expiration of the limitations period.

### 2. Equitable Tolling

Equitable tolling applies only in "rare and exceptional" circumstances. *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (citation omitted); *see also Smith*, 208 F.3d at 17.

> To show that extraordinary circumstances 'prevented' him from filing his petition on time, [P]etitioner must 'demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the [P]etitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances.

6

*Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001) (quoting *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000)).

Here, petitioner has failed to make any such argument. While petitioner identifies that pandemic extensions were being instituted by the state government, he fails to indicate how he was specifically impacted by COVID or how it prevented him from timely filing the instant action. "While the pandemic undoubtedly created lamentable challenges for habeas petitioners, courts in this Circuit have held that its mere existence is not alone sufficient to warrant equitable tolling." *Cohen v. Superintendent of Sing Sing Corr. Facility*, No. 1:22-CV-2553, 2022 WL 2704509, at *4 (E.D.N.Y. July 8, 2022) (citing cases).

Moreover, petitioner cannot assert that he pursued his claims diligently. More than three years passed between petitioner hearing the testimony in the civil trial, on March 23, 2017, and the filing of petitioner's 440 motion claiming that he was actually innocent based on that allegedly perjured testimony. *See* ¶ 32 ("Even though Prindle's post conviction testimony at a civil hearing was raised in a CPL 440.10 motion to vacate the conviction showing that Prindle committed perjury, Chenango County Court . . . denied [petitioner's] motion."). Further, there were just over seven months that expired beyond the termination of petitioner's appeals for his 440 motion, on July 19, 2022, and the filing of the instant petition, on February 28, 2023. Equitable tolling has been denied in similar circumstances, deeming the time periods too lengthy to constitute a diligent pursuit of an individual's rights when they are not accompanied by any reason for the delay. *See Ruffin v. Superintendent*, No. 9:18-CV-0061 (DNH/ATB), 2019 WL 1929985, at *6 (N.D.N.Y. Apr. 5, 2019) ("Petitioner waited three years after the *Miller* decision to file his . . . 440 motions in state court . . . There is no evidence that petitioner was 'diligently' pursuing his rights, and there were no 'extraordinary

7

circumstances' standing in petitioner's way, preventing him from filing his petition sooner."); *see also Bellamy v. Fischer*, No. 1:05-CV-2840, 2006 WL 2051038, at *5 (S.D.N.Y. July 24, 2006) ("[Petitioner] sat on his rights for nearly two years, and thus clearly failed to pursue his rights diligently."). The same holds true here.

Consequently, petitioner has failed to establish either an exceptional circumstance or causal link; therefore, equitable tolling will not save the untimely petition.

### 3. Equitable Exception

Courts have also recognized an equitable exception to the one-year statute of limitations under 28 U.S.C. §2244(d)(1) in cases where a petitioner can prove actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). It is important to stress that "[o]nce guilt is . . . established . . . a federal habeas court will not relitigate the question of guilt for a state defendant who protests his actual innocence . . . [r]ather, a federal habeas court will review state convictions for constitutional error." *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019).

An actual innocence claim will be recognized only in a "narrow class of truly extraordinary cases [where a petitioner can] present[] credible and compelling claims of actual innocence." *Hyman*, 927 F.3d at 656 (citing *Schlup*, 513 U.S. at 315) (internal quotation marks omitted); *see also House*, 547 U.S. at 538 (noting that the actual innocence gateway standard is "demanding and permits review only in the extraordinary case.") (internal quotation marks omitted). "The petitioner's burden in making a gateway showing of actual innocence is deliberately demanding." *Hyman*, 927 F.3d at 656 (citing cases). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness

8

accounts or critical physical evidence–that was not presented at trial." *Schlup*, 513 U.S. at 324; *see also Rivas v. Fischer*, 687 F.3d 514, 518 (2d Cir. 2012); *Whitley v. Senkowski*, 317 F.3d 223, 225 (2d Cir. 2003). In addition, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327);[10] *see also Doe*, 391 F.3d at 160-62.

"The standard's demand for evidence *of innocence* references factual innocence, not mere legal insufficiency." *Hyman*, 927 F.3d at 657 (quoting *Schlup*, 513 U.S. at 316 & *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)) (internal quotation marks omitted). In clarifying what this standard requires, the Second Circuit explained:

> a reviewing court assessing the probability of actual innocence is not limited to the trial record. To the contrary, it "must consider all the evidence, old and new, incriminating and exculpatory," *House v. Bell*, 547 U.S. at 538 . . . (internal quotation marks omitted), and, in doing so, "is not bound by the rules of admissibility that would govern at trial," *Schlup v. Delo*, 513 U.S. at 327 . . . This is because, at the gateway stage of inquiry, a habeas court's task is not to identify trial error or to delineate the legal parameters of a possible new trial. It is to identify those cases in which a compelling showing of actual innocence would make it a manifest injustice to maintain conviction unless it was free of constitutional error. Thus, incriminating evidence obtained in the course of an unlawful search, or custodial admissions made in the absence of Miranda warnings, may well be inadmissible at trial. Nevertheless, such evidence is properly considered in assessing factual innocence, with the manner of procurement informing reliability and relevance and, therefore, weight.

*Id.* at 658.

---

[10] *Schlup* and *House* involved procedurally defaulted claims. *See McQuiggan*, 569 U.S. at 386. The Supreme Court in *McQuiggan* held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, the expiration of the statute of limitations." *Id.*

Here, petitioner cannot meet this high burden. First, petitioner must show that the evidence is newly discovered, so that it "could not with due diligence have been discovered before or during trial." *United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992). However, the father "commenced a personal injury action against [petitioner] while the criminal matter was pending and, in 2017, obtained a judgment against [petitioner] in excess of $1 million." *Prindle v. Guzy*, 216 A.D.3d 1321, 1322 (3rd Dep't 2023). Accordingly, petitioner was aware of this testimony during the course of his trial and absolutely had access to it during his direct appeal. Therefore, it is doubtful that the evidence can be considered new.

Further, petitioner uses other witness testimony from his criminal trial to attempt to bolster his argument that the father presented perjured testimony in the civil trial. *See* Guzy Aff. ¶¶ 13, 15, 17, 24-25, 29; Dkt. No. 5 at 29-33, 42, 46-47, 56, 58. Relying on any such testimony from the criminal trial is inappropriate because it is not new evidence.

Even assuming the evidence is new, it is far from compelling. The Third Department's decision affirming petitioner's conviction discusses the relevant facts underlying the criminal conviction.

> On the afternoon of October 27, 2014, [petitioner], a retired police officer carrying an unlicensed semiautomatic handgun, was driving his vehicle while under the influence of alcohol on a state highway in Chenango County. [Petitioner] closely approached and eventually passed an SUV that was being operated below the posted speed limit by Derek D. Prindle (hereinafter the son), whose father, Derek S. Prindle, was in the front passenger seat. **While the accounts differed as to what transpired, it was undisputed that, after [petitioner] passed the Prindle SUV, both vehicles pulled into a parking lot and words were exchanged. During the encounter, [petitioner] shot the father in the stomach, injuring him, and also shot the son in the chest and abdomen, causing him to bleed to death. The father and son were unarmed and no weapons were found at the scene.**

10

*Guzy*, 167 A.D.3d at 1231 (emphasis added).  The Third Department went on to discuss Prindle's testimony at trial:

> the father, a 61–year–old retiree, testified that his son, age 26, was driving an SUV on the two-lane state highway about 51 miles per hour in a 55–mile–per–hour speed zone. . . . [Petitioner] pulled into the parking lot, followed by the son and the father in the SUV, and then [petitioner], who appeared to be "very [a]ngry" and "very irate," exited his vehicle and approached the SUV, yelling, "Have you got a f* * * * * * problem?"  When [petitioner] was about six inches from the passenger side of the SUV, [petitioner] said, "I'll kill you both ... [b]ecause you're a f* * * * * * a* *hole."  [Petitioner] then spit in the father's face and, when the father stepped out of the SUV, [petitioner] shot him in the chest.  The son exited the vehicle to help his father and tried to restrain [petitioner] by pinning him to the SUV, and the father tried to grab [petitioner]'s arm and kicked him in the groin.  At that point, [petitioner] shot the son twice, once in the chest and once in the abdomen, and then fled.  **There were no eyewitnesses to the shooting.**  A few witnesses testified to seeing wrestling or grappling among two or three men from a distance.  An attorney driving by testified that he saw two older men appear to grab one another and then saw two men (presumably the father and the son) grab the "lone guy" (presumably [petitioner]).  Several other witnesses testified to what the father stated immediately after the shooting, including that the incident began with road rage, that [petitioner] said he would kill them before shooting them and that [petitioner] hit the father in the head with the gun and spat in his face.  **Some of the accounts contained inconsistencies with regard to, among other details, who pulled into the parking lot first and which person [petitioner] shot first.**

*Id.* at 1232-33 (emphasis added).  Ultimately, the Third Department opined that while "a different verdict would not have been unreasonable," the court needed to "defer to the underlying credibility assessments of the trier of fact, which had the opportunity to view the witnesses and hear the conflicting testimony."  *Id.* at 1233.  Accordingly, "the trier of fact credited [the father's testimony] . . . that [petitioner] was driving aggressively . . . exited his vehicle and approached the SUV, cursing and angry[,] . . . [and] threatened to kill the father

11

and the son before spitting in the father's face." *Id.* In sum,

> the evidence, including [petitioner]'s conduct, threats to kill the father and the son and the surrounding circumstances, convincingly established that, acting with the requisite intent, [petitioner] attempted to kill the father and killed the son, and he caused serious physical injury to both by means of a deadly weapon, committing the charged crimes of attempted murder of the father, intentional second degree murder of the son and assault in the first degree as to both victims.

*Id.* at 1234.

Here, petitioner argues that the father's testimony at the civil hearing was inconsistent with the version of events he proffered at the criminal trial. Guzy Aff. ¶¶ 8-10, 12. Specifically, petitioner states that when the father was recounting the details of the altercation during the civil trial, the father noted that petitioner shot his son, walked over to him, placed a gun against his head, and then left the scene. Guzy Aff. ¶ 3. The father "clearly perjured himself when he lied about the gun being put to his head by the Petitioner and attempting to assassinate him." Guzy Aff. ¶ 10. This perjury was motivated by the father's desire to secure a substantial damages amount against petitioner's police pension. Guzy Aff. ¶ 31; *see also* Guzy Aff. ¶¶ 32-33 (explaining that the "numerous material misstatements in [the] civil hearing and criminal trial" resulted in petitioner's rights being violated and "[t]he only possible alternative is that the Petitioner . . . is actually innocence . . . [because t]he Petitioner was convicted of the above charges based solely on [the father's] testimony.").[11] However, petitioner's conclusion that the father's testimony amounted to

---

[11] Petitioner further argues that an alternate version of events, supported by other witness testimony from the criminal trial, is what actually occurred because crediting that witness testimony leads one to the ultimate conclusion that "[t]he altercation could not have occurred as [the father] testified, and had to occur as [petitioner] stated it did." Guzy Aff. ¶ 27; *see also* Guzy Aff ¶¶ 13-26, 29-30, Dkt. No. 5 at 29-64 (identifying other witness testimony that is consistent with petitioner's version of the events that he shot the son first, while the son was trying to disarm him and petitioner was in fear of his life, and that he subsequently shot the father).

perjury is faulty for several reasons.

First, it appears that, at worst, the father's testimony may be inconsistent; however, it is far from willfully false. "A prior inconsistent statement does not rise to the level of perjury." *Smithwick v. Walker*, 758 F. Supp. 178, 186 (S.D.N.Y. 1991), *aff'd*, 948 F.2d 1278 (2d Cir. 1991). Instead perjury requires a witness to "give[] false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94-95 (1993).

Throughout the criminal trial, the subject of when and whether the father felt petitioner's gun against his head came up several times. The father explained that any statement given at or directly after the time of the shooting may not demonstrate his reasonable assumption that petitioner placed his gun against the father's head; however, after five days had passed and the "large bump like a jelly bean [developed] to the top of [his] head" and it became known that petitioner's "gun jammed with the fourth shot in it, [the father, along with 'anybody with a brain,' was confident in his] assum[ption that petitioner] came over to finish [the father] off before [the petitioner] left the scene." Dkt. No. 5 at 24. Further, during the father's direct testimony he stated that he "did feel a gun being put to the top of [his] head, and [he]'ll get back to that in a minute." Dkt. No. 5 at 27; *see also* Guzy Aff. ¶ 9. Accordingly, to the extent there was an inconsistency – which would be insufficient to establish perjury – a complete reading of all of the father's testimony seems to clarify his perspective and recollection of the events as they unfolded.

Moreover, the Third Department's analysis indicates that there were several other witness accounts corroborating the father's assumption, reporting that petitioner hit the father on the head with his gun. *Guzy*, 167 A.D.3d at 1233. Therefore, there is nothing in the

13

record, nor has petitioner proffered any evidence, to support the conclusion that the father's testimony was willfully false.

Second, petitioner's present arguments do not point to any actual factual evidence of innocence. Instead, the best petitioner's argument can hope to do is impeach the testimony of the father. But "[t]his sort of latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed . . . petitioner's [account of the] actions." *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992).

The existence of differing accounts and no eye witnesses to the actual shooting were already identified as complicating factors by the state courts. Petitioner's present argument, that there were other accounts of the incident that tended to support his version of events, was also already acknowledged by the Third Department. In fact, the Third Department's decision noted that a different verdict would not have been unreasonable; however, that does not mean that presenting more, slightly different impeachment evidence would have changed the outcome.

"Indeed, the Supreme Court has stated that newly discovered impeachment evidence is a step removed from evidence pertaining to the crime itself and tends only to impeach the credibility of the witness," instead of actually demonstrating actual innocence. *Jones v. Annucci*, 124 F. Supp. 3d 103, 124 (N.D.N.Y. 2015) (citing *Calderon v. Thompson*, 523 U.S. 538, 563 (1998)) (internal quotation marks omitted). Petitioner's conviction remains supported by unrefuted evidence including (1) petitioner's outward attitude and conduct; (2) petitioner's persistent and severe threats to kill the victims; (3) the fact that neither the father nor son had a weapon; and (4) the fact that both the father and son were shot and severely

injured (one to the point of death). Further, the factfinder ultimately believed the father's account of what transpired, and federal courts cannot disturb that determination for habeas relief. *See Love v. Martuscello*, No. 1:17-CV-6244, 2022 WL 2109244, at *8 (W.D.N.Y. June 10, 2022), *lv. appeal dismissed*, 2022 WL 17684817 (2d. Cir. Nov. 28, 2022), *cert. denied*, 143 S. Ct. 2441 (2023) (denying petitioner's argument that the factfinder "should have weighed the credibility of the witnesses differently and drawn alternate inferences from the proof," because "[n]either [courts] on direct appeal nor . . . federal habeas . . . [are] permitted to revisit the factfinder's determinations as to the witnesses' credibility and veracity.") (internal quotation marks and citations omitted).

In conclusion, the undersigned "cannot say that the [petitioner's] evidence is so compelling and unequivocal that no reasonable juror would have convicted [him] in the light of it. [Petitioner's] testimony just adds a new voice to a highly complex, and often inculpatory, evidentiary record." *Wilson v. Cromwell*, 69 F.4th 410, 422 (7th Cir. 2023). Therefore, petitioner has failed to establish an equitable exception that will save his petition from being time-barred.

## IV. CONCLUSION

**WHEREFORE**, it is

**RECOMMENDED** that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety; and it is further

**RECOMMENDED** that no Certificate of Appealability ("COA") shall issue because petitioner has failed to make a "substantial showing of the denial of a constitutional right" as

15

28 U.S.C. § 2253(c)(2) requires;[12] and it is further

**RECOMMENDED** that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

**ORDERED** that the Clerk of the Court respectfully provide petitioner with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk shall serve a copy of this Report-Recommendation and Order upon the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).

DATED: October 26, 2023

Miroslav Lovric
U.S. Magistrate Judge

---

[12] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).